Our third case for this morning is Richard Clark v. River Metals Recycling, Sierra International Machinery. This is an appeal from a ruling by Judge Gilbert in the Southern District granting summary judgment on behalf of both of the defendants. And of course, according to the summary judgment standards, the evidence and the facts had to be looked at in the light most favorable to the non-moving party, all reasonable inferences had to be drawn from those facts and evidence, and any factual disputes had to be resolved in favor of the non-moving party. That was the plaintiff. If the judge correctly threw out your expert under Daubert, and I realize you're challenging that here, but how could you have survived summary judgment? Yes, Your Honor, in several ways. First of all, this is a very simple piece of equipment. We are talking about whether it is safe or unsafe to go up and down from a five-foot platform every day, and whether or not a ladder was required to do so. So don't you mean that at least it's a simple aspect of a machine that perhaps was complicated in some respects, but the only question here is how do you get up and down from a five-foot high platform? That's absolutely what we mean. And there are numerous cases that interpret that type of an issue. Whether or not this particular piece of equipment was complex is not relevant to the issue in this case, which is just whether or not you could get up and down from the platform on the end of it, and whether that would be understandable by a simple layperson. In the McDaniel case, there was... Excuse me. The difficulty that I have with that argument is I understand what his job responsibilities were. He had to get up and down each day, and he needed a ladder of some sort, but it's not clear to me that the ladder needed to be attached to the equipment. Whether the ladder's attached to the equipment or not, it's still a simple matter of whether or not somehow you ascend and descend that platform every day, and a ladder, whether a ladder had to be attached, or there was some evidence that a stand-alone ladder could have somehow been placed on the machine and taken around with it. But these are all simple concepts that could have been understood by any layperson. But with the... I'm sorry. Go ahead. Go ahead. Sorry. But with the expert gone, right, if that... Let's just assume for discussion purposes that the Daubert strike was proper. Are we just supposed to look at this car crusher, this baler, and say, well, it looks like a ladder should be attached? And therefore, it's a jury question. Yes. I believe that's correct. If you look at the Eberle case in the Fourth Circuit in Illinois, that was a case that involved a spray gun. But the issue before the court was whether or not it required a guard and whether the guard would have made it more safe. That's very akin to the issues we have in this case. It didn't matter to the court how the spray gun actually operated and what the mechanics and complexity of that were, just whether or not it should have been prevented from being turned on at all at an inopportune time. Likewise in the... Well, and if I can just point out, Your Honors, that this particular piece of equipment, this car crushing machine, was not even on at the time the accident occurred. They're not... When he's going up and down doing maintenance, that aspect of the machine is not being used. The only issue is whether or not he can safely ascend and descend the platform in order to do the maintenance that he's required to do every day. But wouldn't it matter in terms of whether or not the ladder is feasible to go in a specific place to see the equipment in its entirety? Yes, and my expert did see the equipment in its entirety. And what... But I hear you saying two different things. I understood what you were saying a moment ago was that in order to determine if the risk utility or consumer expectation test applies, that you only look at the ladder, you don't look at the car crusher. Correct. But you're also saying that the ladder didn't necessarily have to be affixed to the RB6000, that it could have been portable, he could have walked over with it. I'm not sure how far we're going with your theory. My expert believed that the safest alternative was to affix a ladder to the machine so that it couldn't be blown off, lost when it was traveling down the highway. A foldable ladder of some type? And so... Did the expert... Did somebody need to say whether it would fit or... That was discussed in the case. And that had to do with the dimensions of the trailer and what's allowed on the highways in Illinois and other states that this piece of equipment traveled to. And that was why there was testimony that rather than sticking out from the side of the trailer, the ladder could be made in such a way that it was... When it was unfolded, it would rest completely under the trailer and not make it any wider than it was, and then could be folded back up and out. That sounds like something you might need expert testimony on. I can certainly see a concept that if you make this logger-bailer, you have to furnish a ladder that can be used even if the person has to stow it somewhere afterwards or do something. But the closer you get to imagining where it would actually be affixed to the machine, it sounds like product design to me. Well, and Your Honor, it brings up a very compelling part of this case, which is that the defendant's expert, his 30B6 witnesses, and the employee that they identified as the person most knowledgeable about this piece of equipment and who was responsible for its manufacture all testified that that would be feasible. And some even testified that it was dangerous without one. But they all testified that there was a way that that could have been attached to this piece of equipment. Let's assume they testified to that. I think opposing counsel would dispute that's what the testimony was. But let's assume for a moment that they did testify to that. Did you raise that testimony in response to the motion for summary judgment before the district court? Your Honor, that argument was not raised by the defendant. It came up for the first time in something that the district court judge said. And then we responded and raised it in our motion to reconsider. And then for the first time, the defendant responded to our response. Certainly the defendant in the summary judgment briefing and the opening brief challenged your expert, Dr. Blundell, and challenged the admissibility of his opinions. In response to that, did you say, doesn't matter, we have plaintiff's own or defendant's own witnesses who testified to A, B, and C? It wasn't explicitly stated in our response that we had these other witnesses. Now, we did respond in our response to the River Meadows motion for summary judgment that we intended to rely upon the testimony of their experts. But that's one that, do you mean the first River Meadows that was denied? No, not the very first one. There was a second one which we responded to some time ago. How was it that the district court possibly could have known in ruling on summary judgment that you intended to rely on testimony from the defendant's witnesses if your expert was thrown out? Your Honor, it's our position and belief, based on the law, that it's not possible while we can waive arguments, you can't waive the evidence. And the evidence in this case was that their witnesses would have testified in our favor that it was feasible and, and, um, yes. But you do have to call it to the district court's attention. That's otherwise, you know, the judges are left with wading through an enormous mass of documents without any guidance. And Your Honor, we had anticipated and requested an oral argument on the motion to strike our expert witness. There was a Daubert challenge to his testimony. We, um. You didn't request a Daubert hearing though, did you? We did request oral argument. But you didn't request specifically a Daubert hearing, which is very different than oral argument. I understand. But there is also case law in the Padilla's case that says that is not the function of the attorney, but rather the court to know, uh, take care of those housekeeping matters and know that a hearing is required. The Padilla's case says it's an abuse of discretion in that particular case and can be an abuse of discretion not to hold an in limine hearing or a Daubert hearing in order to test the factual basis of that expert's opinion. Even if we suppose that there's no procedural irregularity with the way you went about it, I just sure did not read the evidence coming from the other side as saying that the lack of any kind of like a fixed ladder, one that you can stow under, makes this particular model unreasonably dangerous. In other words, I read the evidence on the other side to be saying, sure, of course. There are, um, more recent models of car crushers that have attached ladders. In fact, there's several pictures of them in the record here. But that, that doesn't prove that this particular one suffers from a design defect. Because if that were true, that would be like saying, you can look at my kid's high school car. It doesn't have passenger side airbags. You know, compare it to my wife's car and say it's defective. It just doesn't, it doesn't work, the law doesn't work that way, does it? Well, the law does allow for evidence of subsequent designs to serve as the alternative feasible design. And so, yes, the law... It shows an alternative feasible design, but why does it show that there is an unreasonably dangerous design defect in the prior model? Well, typically the unreasonableness, the unreasonably dangerous issue is one that's a factual question, which is to be determined by the jury. So let me just ask, it seems to me, I hesitate to use the term reciprocal, but it seems to me that you're saying that short of standing on the ground and leaping up five feet, somehow or another, a person has to both get up to this five foot platform and get back down again. And they're not supposed to... And so the design problem is just sort of the common sense, how do you scale that distance? That's correct. And to your point about that they are warned, there's actually, that's a bit of a red herring in this case, because everyone acknowledges that the operator's manual was not passed on and that the plaintiff would never have seen it. But he seems to find a foothold somewhere, he doesn't just jump all the way down five feet. No, he does not. He describes how he holds on and he steps down to what they call the outrigger, which holds it stable while it's in place and operating. He steps down to that, which is much closer to the ground, and then lowers himself down to the ground. So he does the best he can. According to Mr. Torres, their expert, their employee that they say is the person who has the most knowledge, there is no other way to get on and off except climbing, unless there's a ladder available. And so this is what he's given, this is a man with an eighth grade education who has a good job, and part of his job involves climbing up there every eight hours to replace those fluids that have been depleted. And with no ladder provided, he had to figure out a way, and as Mr. Torres says, climbing would be the only way. To me, I believe that that is something that is so basic that it is within the confines and understanding of the common layperson, such as would be found on the jury in this case, whether or not ascending and descending from a five-foot platform is unreasonably dangerous if there's not a proper means to do so. In making that assessment, should the court look at the job that your client was seeking to perform when he climbed the ladder? Is that relevant at all to the analysis, or you're saying you just look at the ladder? You look at the fact that he, the job that he is required to perform is to get up there and do some routine maintenance. Right. You have to figure out where the openings are to replace the fluids. Does that matter to the analysis? Absolutely not. There are things on top of that platform that he must access. Everyone agreed with that, the defense expert testified to that. Not all of them, some can be performed from the ground, but there are some that require him to be up on the platform. Where those things are located, whether they're in the left corner, the right corner, makes no difference because he has to get up there to do them. That was a big issue that the judge had, was, well, he doesn't know where the radiator is from the hydraulic tank. It doesn't matter. They're up there, and he was required to get up there, which required him to climb or scale this height and to somehow figure out how to get off of it once he got up there. Okay. If you want to save your last minute and a half, you can do that. Thank you. All right. Mr. Craney? May it please the court. My name is James Craney. I'm representing the co-appellee and a co-defendant in this case. In order not to duplicate arguments, and my understanding was I was going to keep five minutes, and the other defendant was going to keep 10. All right. Just watch your time. Okay. I'm going to be addressing only the issues raised in our cross-appeal and in the appeal that were not raised, that were not dealt with in the district court's judgment. Issue first, neither plaintiff nor my co-appellee seem to take issue with or argue against this point that we filed a Certificate of Manufacture under Illinois' Innocent Seller Statute 735 ILCS 5-2621 later in the case. The district court, so that operates as essentially a motion to dismiss without prejudice. The district court denied that, finding that it was untimely. There aren't that many opinions in the appellate court jurisprudence that have dealt with this, but we've cited a case directly on point that says that if that were the interpretation of the statute, it would render language moot. The statute itself says that you are supposed to raise the certificate upon answering or otherwise pleading, and the statute goes on to later talk about due diligence in finding the identity of the manufacturer. In this case, it wasn't clear originally that our co-defendant in the case would, as a matter of law, be a manufacturer under Illinois law. When we found that out after supplemental discovery was allowed, we raised it, and it does not appear that anybody's arguing against this issue. So to me, it seems that we should be out on that doctrine, and it is a dismissal with prejudice. That's why we raised it as a cross-appeal. I didn't want to waive that issue. The other issue that I will raise was not dispositively dealt with by the district court in this case, and that is the issue of, in this case, against all defendants, only strict liability has been raised. You'll see from the record that initially on behalf of my client, I moved for summary judgment, erroneously arguing against negligence theories. I was doing that because some of the evidence in the case and the way the questions were being asked, it seems to me that they were pursuing what's kind of a standard move where you would go strict liability and negligence, and I thought that they were going to amend their pleadings. That seemed to be the thrust of the case. We were wrong about that. When we learned that this doctrine, the doctrine of this case that's at issue is only strict liability, we filed a second motion for summary judgment. The argument I'd like to touch on briefly is just that in this case, River Metals purchased this product, the entire product, used, and there is a doctrine that has been developed under Illinois law that's in our briefs called the Peterson Doctrine. It's been applied in various cases, and it says that when you are a defendant who places something into the stream of commerce, but you purchased it used, you are no longer within the original producing and marketing chain. In brief, it means that, it stands for the proposition, this doctrine, that only if you're in the original producing and marketing chain are you in a position to exert upstream control, upstream, maybe control isn't the right word, but upstream influence to push safety considerations with the main manufacturer. Because we weren't in the original producing and marketing chain, because we purchased this item used, we should be out. The appellant will argue that, well, we have cases that speak otherwise. I'd like to come back, maybe reserve a minute on rebuttal to address those. I will ... Okay, I think you're about there, then. Yeah. Okay, thanks. Mr. Socolow. Good morning. May it please the Court, my name is John Socolow, I represent the Appellee Sierra International Machinery LLC. I'll be as brief as I can. Judge Gilbert got it right at summary judgment. He did not abuse his discretion at any stage of the proceedings. He performed an exhaustive review of the record. Mr. Socolow, what's your position on the appropriate test to determine if the risk utility or consumer expectation test applies? Do you look at the entire car crusher, just the ladder, something in between, and what's your support for that position? My position on that is that the risk utility test applies to the entirety of the machine, the whole thing. Why is the entirety of the machine relevant here when we're just talking about a platform? It could be a platform in a high school gym that somebody has to get up to, to talk on. It could be a platform, part of this machine. The machine wasn't on, it wasn't being operated as a car crusher, no one cares what this machine does. Well, it's a highly specialized machine. Fine. I mean, but it's not being used that way. It's like if I asked you to jump up here onto the podium, you'd have to figure out a way to do that. Correct. You have to figure out a way, if you're going to use the fixed ladder method, which is what Dr. Blondel testified to at his deposition, and I believe in his report as well, he also said a fixed ladder is required. Where does that- But you conceded in your brief that that could be attached to the machine. So why do we need expert testimony? But the question is where and how. There's been no analysis by Dr. Blondel, none whatsoever. Why is, I mean, just frankly looking at a picture of the machine, it seems pretty obvious that it's by this platform that requires quite regular servicing, you know. Well, there are, if I may, there are pictures of the machine when it is hooked up to a tractor, and there are pictures of the machine when it's not hooked up to a tractor. Why is that relevant? It's relevant for a couple reasons, which Sierra's expert pointed out at his deposition. The photo in particular I'm referring to was attached to our summary judgment. It's at page ID 2161. It's relevant because if you look there, you'll see the tractor backed up under the platform at the front end of the car crusher. There's a tractor going in and out of there. However frequently, this logger baler crusher needs to be transported from one junkyard to another. So you have to, if you're going to have a fixed ladder, it's got to be situated in such a way, one, that whoever's backing the tractor up doesn't bang into the ladder and knock it off. Two, it's got to be. Suppose that the accident here occurred around the cockpit or the cab. Okay, it had nothing to do with this front part and this hydraulic fluid area. And the plaintiff's job was just to make sure that the cab or the cockpit was in good working order. And looking at the picture, we saw no ladder. No, there is one here. There is one. Thank you. Okay. But suppose we just looked at the picture and we saw, well, how in the world is somebody supposed to get in that cockpit then, or that cab? Would you take the same position with respect to, well, it's a big, complicated piece of machinery and risk utility applies, and you need an expert to tell you that you need a ladder to get in the cab? I would. Absolutely. So there's no room whatsoever for common sense in your view? I mean, it just seems astonishing to me. I mean, there are all sorts of complicated machines that we deal with every day. You know, I drive a car to work most of the time, and one of the things I need to do sometimes with my car is put windshield wiper fluid in it. So I put windshield wiper fluid in it. Does that mean that I also have to understand, you know, the way the hybrid motor works? I don't think so. I mean, there's some very simple things that you do with very complicated pieces of machinery. I agree, but some machines are designed in such a way where you need to do a little more than just use what's given to you, but I just wanted to finish my point about the location of the ladder at the front end of the machine. In addition to having to account for someone backing the tractor up to connect it to the trailer, there are width restrictions. You can't have the ladder sticking out from the side, or the trailer may no longer be street legal. And in addition, and again, I'm referring to page ID 2161. Once this thing goes back on the road, you know, at some point, whoever's driving it is going to turn left or right, and that will necessarily involve the wheels at the front that are part of the tractor turning left or right outside the limits of the width of the trailer. And you don't want to have the driver turn and have the wheels bang into the ladder and cause a tire blowout or cause the ladder to fall off. So I think it's... So you've never heard of folding ladders, I take it, or ladders made out of rope or other kinds of ladders that wouldn't do that. I have heard of folding ladders. I mean, it seems to me so obvious that if you're going to get a human being from ground level up to five feet for proper business reasons, that you need to give that person a way to do it. Just like with the cab or anything else, and zero doesn't seem right. Well, Sierra did give its customers a way to do it in terms of the training that it's provided to the original purchaser of the machine. There was extensive testimony from Mr. Torres when he testified as a 30B6 witness on issues relating to maintenance and how do you get up and down. That deposition occurred in September of 2016, and he was very clear that Sierra recommends a ladder or a platform or a lift for the person performing the maintenance to get up and down. The front platform is not the only part of the machine that has to be accessed. But it's the only part at issue in this case. It's the only part at issue right now in this case. So another part might have greater design challenges where you would just have to win that Rule 702 inquiry, but this one may not be that way. This one may not be that way, but there's been no analysis in terms of what can fit in that space. There's been absolutely nothing from Dr. Blundell, and he admitted as much. He just said he hasn't done the analysis. No, it's from your witnesses, I guess, that the feasibility is. Let's forget about Dr. Blundell who didn't apparently look in much detail at any of this stuff. Understood. But again, when Sierra sells this machine specific as training, it's an industrial product. It's not a consumer product. And I would analogize this perhaps to an airplane where you have a mechanic who has to get up at wing level, whether it's a Cessna 172 or a Boeing 737. It may be out of their reach. They need to access a certain area. And if you go over to O'Hare or Midway, you'll see mechanics with ladders or rolling platforms. It's industry. It's not someone doing work in a... What's your response if we do look at some of the evidence that your folks, I think, brought forward or was out there of all these different alternatives that are out, you know, the pictures in the appendix? There's one picture after another with different ladders that are affixed. That are affixed? Yeah, meaning they're part of the machine. Well... They're attached on there. And those were at the cab end of the machine, not the front end of the machine. There was one RB6000S, which is different than the RB6000. It was a one-time, once-only product that was designed, built completely in Italy. And it was shipped to the United States, all done, ready to go. Sierra didn't need to do anything with that other than check the fluids, put some stickers on it, and it's ready to go. If you look at the photos of that, you will see that the front end is a complete redesign. And as Judge Scudder pointed out earlier, just because something has an improvement or is better doesn't mean that the prior design was defective and unreasonably dangerous. And I think that's the key focus, was the prior design unreasonably dangerous? Just because there's an improvement doesn't make the predecessor substandard in any way. What about Mr. Rogers' testimony? Is that something that would support plaintiff's position without the expert? No, I don't believe so, because Mr. Rogers' testimony echoed what Sierra says in its training. He agreed... Well, first of all, he agreed that, yes, a ladder is possible, but it's difficult. And it's difficult for the reasons I spelled out in terms of interaction with the cab and complying with width restrictions. Secondly, he did acknowledge the possibility to use portable and detachable ladders. That's basically the exact same thing that Sierra tells its customers and  Okay? Thank you. Thank you. Ms. Jones. Your Honours, what we're talking about here are evidence of an alternative feasible design, and Sierra has both in post built machines shown that they're able to affix a ladder in order to climb and descend the platform. It doesn't matter if they only did it one time or if they did it 100 times. There is evidence, and I apologize for not being clear on this earlier, there is reference to the testimony of Mr. Torres in our response to summary judgment, if you would refer to page 16 and 17 of Mr. Cook's response, where he sets out the testimony of Mr. Torres that a folding ladder would be able to be attached without extending past the edge of the platform, that it would be feasible, and it would provide a way to safely get on and off the machine. Also referred to is the testimony of their expert, of course, as well as testimony of Mr. Simmons and Mr. Olds on alternative feasible designs. The duty to provide a ladder is a non-delegable duty, and so to stand here and say that their expert said, well, yes, we give them instructions on how to use it and we tell them that there should be a ladder out there for them is not useful. That's something the manufacturer has to resolve for himself, has to provide that duty. In this case, it was improper to grant summary judgment because this was a simple piece of equipment. Expert testimony was not necessary, but given the expert testimony that we had, when Dr. Blundell was asked what would this alternative feasible design, this ladder down at the platform end, look like, he said, well, it would look like the one you have on the other end of the same machine to get up and down from the cab. When you have something that people can look at right there in photographs as we have in our appendix on the machine itself, there's no need for him to sit down and draw out a picture of what a ladder at the other end would look like. He very clearly answered it would look like the one on the cab end that you've already provided. This case clearly raised issues that created submissible issues to be determined by the finder of fact and should have been allowed to proceed in that manner. The plaintiff would ask that you reverse the district court's decision and to reverse the summary judgment and send this back for further. All right. Thank you very much. Thank you. And Mr. Craney, I think you reserved a minute for the cross-appeal rebuttal? You don't need to use it if you don't want to. I won't use it. All right. Fine. Thank you. Thanks to all counsel then. We will take this case under advisement.